Tobin Bereznak; Plaintiff in *Propria Persona*
9541 Dudley Drive
Westminster, Colorado 80021
(303) 888-9939; tobin.bereznak@gmail.com

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY 24 2023

JEFFREY P. COLWELL
CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**
Byron G. Rogers Courthouse; 1929 Stout Street; Denver, CO 80294

TOBIN BEREZNAK

PLAINTIFF,

v.                                                  CASE NO._____

ARROW ELECTRONICS, INC.

DEFENDANT.

_____/

## COMPLAINT FOR DISABILITY DISCRIMINATION, RETALIATION, AND NON-JOB RELATED AND DISABILITY-RELATED TREATMENTS, TESTS AND INQUIRIES

Tobin Bereznak ("plaintiff"), sues ARROW ELECTRONICS, INC. ("defendant", "Arrow") for violations of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), *42 U.S.C. §12101, et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and the "record of" prongs. Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under *29 CFR Part 1630, et seq.*

### I. JURISDICTION

1. This court has original and exclusive jurisdiction over plaintiff's claims pursuant to *28 U.S.C. §1331*, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; *42 U.S.C. §12101* and *42 U.S.C. §12112(a), (b) and (d)(4)* as it pertains to "discrimination"; as implemented by *29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d)* as it pertains to adverse employment actions, medical privacy, and prohibited medical examinations and treatments.

2. Venue is proper in this judicial district under *28 U.S.C. §1391* because defendant does business in this judicial district and the acts complained of took place in this judicial district.

3. All conditions precedent to jurisdiction have occurred or been complied with.

   a) A charge of employment discrimination on the basis of disability and retaliation was filed with the Equal Employment Opportunity Commission ("EEOC") on or about **June 15, 2022**, and a Notification of Right to Sue was received from the EEOC on **February 24, 2023**.

   b) A first complaint was filed within 90 days of receipt of the EEOC's Notification of Right to Sue[1], thereby satisfying the condition.

4. Plaintiff has exhausted all administrative remedies available to him.

## II. PARTIES

5. Plaintiff is a citizen of the United States and resides in Westminster, Colorado at the address of 9541 Dudley Drive, for all times material to the facts giving rise to the complaint.

6. Plaintiff is an individual with a "disability" as that term is defined in *29 CFR 1630.2(g)(1)*.

7. Arrow Electronics, Inc. is an "employer" within the meaning of *29 CFR 1630.2(e)* and has its principal place of business at 9201 East Dry Creek Road, Centennial, Colorado, 80112 for all times material to the facts giving rise to the complaint.

8. All the discriminatory employment practices alleged herein were committed within the state of Colorado.

## III. PLAIN STATEMENT

9. Plaintiff is claiming defendant discriminated and retaliated against him based upon disability. Plaintiff objected to a new "Covid policy" implemented by his employer. The policy presumed that all employees, including plaintiff, were direct threats and suddenly needed policy-imposed medical treatment for a deadly, contagious disease which the policy was designed to treat. Plaintiff objected, holding that these presumptions failed to rely on objective evidence gathered by conducting an individualized assessment as required prior to regarding and classifying plaintiff as a direct threat. Plaintiff claimed all protected rights; however his employer ignored his claims and began imposing non-job-related medical inquiries, tests and treatments, and invading

---

[1] A true and correct copy of the EEOC's Right to Sue Letter is alleged and included as Exhibit A.

plaintiff's medical privacy. Defendant also retaliated and took materially adverse employment actions, including termination, because plaintiff refused prohibited medical tests, treatments and inquiries, and refused to waive his rights as a condition of employment as outlined in the policy.

### IV. STATEMENTS ON DEFENDANT'S "COVID POLICY"

10. Since 2020, defendant adopted measures known collectively as its "Covid policy", which includes new requirements that employees submit to specific medical treatments, tests and inquiries[2] as new conditions of employment.

11. Defendant admits that its "Covid policy" is intended to treat and prevent the spread of a deadly, contagious disease.

12. The "Covid policy" assumes that every employee, plaintiff included, requires treatment.

13. The policy assumes that all of its employees are simultaneously at risk and pose a risk to the health of all other employees.

14. The "Covid policy" is based upon the pure speculation and hypothetical belief that every employee of defendant is impaired and requires treatment for this perceived impairment.

15. The "Covid policy" assumes that all employees have an on-going and indefinite condition of impairment as long as they remain "untreated" by the mitigation measures outlined in the policy.

16. The "Covid policy" assumes that one person must take a medical treatment in order for another person's medical treatment to be effective.

17. The "Covid policy" imposes a new qualification standard such that "treated" employees may work and "untreated" employees are subject to termination and other adverse employment actions.

### A. Defendant's "Covid policy" is not authorized.

18. Defendant assumes that it has a new legal duty and new legal authority, as well as the medical competence, to impose medical treatments, tests and inquiries to mitigate a deadly, contagious disease.

---

2 These include "Covid vaccines", "PCR tests" and masks which, under the clinical trial phase and FDA's Emergency Use Authorization guidelines, must offer the right of refusal and informed consent, and include practices of disclosure of private medical information.

**19.** The adoption of the "Covid policy" did not create any new legal duty nor delegate any new legal authority to the defendant for imposing any mitigation measures in the policy.

**20.** The "Covid policy" did not create any new legal duty for employees to comply with the policy measures.

**21.** Defendant has no proof of any financial responsibility (insurance, etc.) to demonstrate that it has acquired a new legal duty.

**22.** Defendant does not have proof of an insurance policy which compensates anyone for:

    **a)** becoming infected with a deadly, contagious disease after complying with its policy; and

    **b)** suffering any adverse health consequences as a result of complying with its policy.

**23.** Defendant's "Covid policy" does not contain any legal enforcement mechanism.

**24.** There is no new legislative authority which authorizes employers to demand non-job-related medical inquiries and treatments as new conditions of employment.

**25.** Without proper authority, the "Covid policy" cannot be considered legitimate or mandatory.

**26.** Objectively, the policy relies upon the coerced compliance of employees; or alternatively, upon the employers' willingness to force submission to the policy in exchange for disaster funding.

**27.** Objectively, the policy relies upon gaining the <u>voluntary</u> compliance of employees to waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments under Emergency Use Authorization ("EUA"), and to refuse non-job-related medical inquiries, tests or treatments (rights protected under the ADA).

**28.** A voluntary policy cannot trigger compulsory discipline and termination for non-compliance.

**29.** The "Covid policy" is not a legitimate workplace policy.

**30.** The policy inherently violates the ADA and the ADA-AA.

**31.** The policy inherently violates public health laws.

**B. Defendant's policy triggers violations of the ADA under the "regarded as" prong and the "record of" prong of the ADA.**

**32.** The policy perceives all employees as impaired and in need of treatment with the policy-prescribed mitigation measures.

**33.** The policy regards all "untreated"[3] employees as disabled with a deadly, contagious disease without relying upon any individualized assessment.

**34.** The policy classifies all "untreated" employees as "direct threats" who have an impairment which needs treatment by the policy mitigation measures.

**35.** The policy itself makes a record of impairment by misclassifying all "untreated" employees as "direct threats".

**36.** The policy makes a record of impairment which is not based upon individual assessment.

**37.** Without objective evidence of an impairment, the "untreated" are misclassified as needing "treatment".

**38.** The policy makes a record of impairment via the employer's written communications to all employees and to "untreated" employees.

**39.** The policy imposes mitigation measures upon all workers without considering an individualized medical assessment of an employee's health.

**40.** The policy has no provision to establish through individualized assessment[4] whether a particular employee poses any direct threat to the health of their co-workers.

**41.** The policy regards all "untreated" employees as "direct threats.

**C. Defendant's policy imposes prohibited disability-related and non-job-related medical inquiries and examinations.**

---

3   All employees who did not use the "mitigation measures" outlined in the policy are considered "untreated". These mitigation measures include wearing masks, taking "Covid tests", taking "Covid vaccines", quarantining, segregating, answering surveys, giving vital statistics, reporting "vaccine" status, waiving medical privacy, waiving informed consent.

4   29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

42. The policy requires medical inquiries, tests and treatments which are intended to identify which employees remain "untreated" and thus are still perceived as "direct threats" because of a perceived disability/impairment.

43. The policy asks representatives of defendant to make repeated medical inquiries of employees, the purpose of which is to determine whether an employee has been "treated".

44. The policy fails to describe how any provision of the policy is directly related to any single employee's essential job functions.[5]

45. The policy fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee.

46. None of the disability-related medical inquiries, tests and treatments are related to the essential job function of the employee.

47. None of the non-job-related medical inquiries, tests and treatments are permitted under *29 CFR Part 1630.13(b)*.

48. Any employee who refuses the prohibited medical inquiries is regarded as disabled/impaired and in need of treatment.

49. The policy fails to include provisions for protecting the medical privacy of employees.

50. The policy fails to provide informed consent to employees.

### D. Defendant's policy lacks procedures and guidance necessary for ADA compliance.

51. The policy fails to provide guidance for defendant to remain compliant with the ADA when implementing the new "Covid policy".

52. The policy fails to provide any provision or guidance for defendant on how to handle employees who refuse "Covid policy" treatments, tests, and inquiries based upon claiming their rights protected under the ADA.

53. The policy fails to outline the process for defendant to follow if an employee claims protected status under the ADA.

54. The policy does not include an ADA compliant appeals process, employees have no redress.

---

5   Defined in 29 CFR 1630.2(n)(2)(i) as "the reason the position exists".

**55.** The policy fails to instruct defendant on how to properly claim and prove an exemption to its duties under the ADA.

**56.** The policy fails to instruct defendant on the process of showing by financial records, that it would suffer an undue financial burden for an employee's refusal.

**57.** The policy fails to instruct defendant on the process of documenting fundamental alterations to defendant's normal operations caused by an employee's refusal.

**58.** The policy fails to instruct defendant on how to properly perform a direct threat assessment.

### F. Defendant's policy deceptively mischaracterizes non-job-related inquiries, tests and treatments, and religious and medical exemptions as if they are ADA "accommodations".

**59.** The policy fails to offer any accommodations[6] whatsoever that are cognizable under the ADA, specifically in *29 CFR Part 1630.2(o)*.

**60.** Defendant deceptively mischaracterizes "medical exemptions" and "religious exemptions" as if they are providing accommodations[7].

**61.** These "exemptions" fail to meet the statutory requirements of ADA compliant accommodations because the "exemptions" are not job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

**62.** The policy also deceptively mischaracterizes non-job-related medical tests, inquiries and treatments as if they are accommodations.[8]

**63.** The policy imposes measures deceptively presented as "accommodations" which are actually non-job-related and disability-related medical inquiries, tests and treatments.

**64.** The policy fails to instruct employers that any employee may refuse any accommodation which is not related to their essential job function.

---

[6] Accommodations are defined in *29 CFR Part 1630.2(o)* as job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

[7] "Medical exemptions" and "religious exemptions" do not qualify as accommodations and the criteria for them is not disclosed, is arbitrary and has no review process. See *29 CFR Part 1630.2(o)(1)(ii)*

[8] "Covid vaccines", temperature checks, "vaccine attestations", weekly "Covid tests", wearing masks, and quarantine, are not job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

**65.** The policy fails to instruct employers that any employee may refuse any accommodation when the employer does not have a *bona fide* exemption from its legal duties under the ADA, *29 CFR Part 1630.15(d)*.

**66.** The policy fails to include guidance for employers on how to process employee refusals to the policy while maintaining compliance with the ADA.

### G. Defendant's "Covid policy" imposes disparate treatment upon "untreated" employees and upon employees who claim protected status.

**67.** The policy is not uniformly or universally applied to all employees.

**68.** One of the mitigation measures established by defendant's "Covid policy" is a "vaccination mandate".

**69.** On the basis of compliance with this non-job-related medical inquiry and treatment, the policy classifies at least three types of employees: (1) employees who are no longer classified as "direct threats" because they are considered treated and cured ("vaccinated"); (2) employees who are still classified as "direct threats" but who are undergoing treatments, tests and inquiries (such as masking, "Covid testing", "vaccine surveys", "health surveys"); (3) and employees who are still classified as "direct threats", remain "untreated" and claim exclusion from the policy on the basis of the protection of the ADA.

**70.** Defendant's "Covid policy" discriminates against "untreated" employees by using a "treated"/"untreated" qualification standard as a new condition of employment.

**71.** Defendant's "Covid policy" is also disproportionally applied to individuals who claim protected opposition to treatments, tests and inquiries ("Covid policy").

**72.** Protected status is claimed by invoking rights under the ADA and/or by claiming a violation of the ADA.

**73.** Claiming protected status constitutes protected activity under *42 U.S.C. § 12203(a);* and places the claimant in a protected class.

**74.** Defendant's policy fails to respond appropriately to employees claiming protected status.

**75.** The policy fails to provide guidance to employers on how to process employees who claim protected status.

## H.  This is a case of first impression and an exceptional condition exists.

**76.** This is a case of "first impression" because plaintiff has claimed rights to medical privacy, private property rights and informed consent to refuse the "Covid policy's" medical treatments, tests and inquiries.

**77.** These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under *29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d)* for the reason that these rights are <u>intangible private property rights of people</u>, and of plaintiff specifically, and are protected by law and are not originated or granted by any statute.

**78.** These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

**79.** Defendant's "Covid policy", which is not authorized by any statute, attempts to overcome established rights that form the bedrock of modern society.

**80.** This is also a case of "first impression" because plaintiff, in using the ADA to protect his rights, has asked the question: how did defendant suddenly acquire a new legal authority or legal duty to treat plaintiff, its employee, for an impairment without any medical examination or diagnosis? The answer of course is that defendant never did acquire any such legal duty or authority.

**81.** This is also a case of "first impression" because, while defendant makes the noble-sounding but disingenuous claim that their "Covid policy" is intended to prevent the spread of "Covid", it has absolutely no financial responsibility to engage in or administer such a policy.

**82.** In fact, employers may adopt a "Covid policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

**83.** This is additionally a case of "first impression" because, if defendant actually had the novel and *bona fide* legal right to require plaintiff to disclose his medical records, then defendant would have the right to simply obtain the name and address of plaintiff's physician and request such records directly from the physician.

**84.** It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

85. An "exceptional condition" exists with this case which must be acknowledged. When the United States District Court itself has adopted the same policies as defendant, it begs the question: can the Court be impartial?

## V. STATEMENTS OF FACT

86. Plaintiff worked for Arrow Electronic, Inc., as a Senior Data Engineer, providing computer data management and programming as a remote worker, since July 7, 2018 through December 1, 2021, when he was fired for reasons of disability.

87. On September 8, 2021, plaintiff's employer sent out a communication to all employees stating that receiving a "Covid vaccine" medical treatment was now a new condition of employment and that no employees would be allowed to enter the workplace or work in the office who did not get show proof of getting this specific medical treatment by December 1, 2021. [Exhibit A -1]

88. Plaintiff alleged in his affidavit that he has not been diagnosed with a communicable disease and there is no court order identifying him as either a direct threat to anyone or imposing quarantine on him; and plaintiff testifies that no individualized assessment has been performed which has shown him to be a direct threat. [Affidavit ¶ 6-10]

89. Plaintiff, a full-time remote employee, contacted his supervisor Tara Marie Gilley, and her supervisor, Mark Sakasai, to find out if this new policy applied to him.  He also asked both supervisors to identify both the legal authority and the legal duty Arrow was relying upon to presume to treat employees with a "Covid vaccine". [Exhibit A-2a]

90. Plaintiff's supervisors failed to provide plaintiff with the legal bases for the policy as he requested but supervisor Tara Gilley agreed to ask Human Resources ("HR") how the policy would be applied to  "a full time Work from Home employee that has no exposure to other employees." [Exhibit A-2-b]

91. Plaintiff took the step of sending Arrow, through it's registered agent Wolz Corporate, an affidavit and demand notice on October 5, 2022, in which plaintiff claimed, and did not waive, all property rights, despite any attempt at encroachment by Arrow upon plaintiff's boundaries. [Exhibit A-3]

92. In the affidavit, plaintiff did not waive any rights and specifically claimed the right to refuse all medical treatments and tests, the right to informed consent, and the right to medical privacy. [*ibid*]

93. Plaintiff specifically gave Arrow ten days to respond to his demand that Arrow produce any evidence of a legal authority which superseded plaintiff's rights and his demand that Arrow produce evidence of its legal duty of care to "prevent the spread of Covid-19" and accompanying insurance policy for this program. Arrow failed to respond. [*ibid*]

94. Plaintiff also stated the new policy was not in his contract and did not pertain to his employment duties. [*ibid*]

95. On October 7, 2021, in response to Tara Gilley's request to HR, the head of HR, Gretchen Zech, sent plaintiff a pre-formatted "Frequently Asked Questions" pamphlet which stated in question 20 that even employees who worked from home exclusively would be required to get a "Covid vaccine"[9] by the company. [Exhibit A-4]

96. This pamphlet also claimed in question ("Q") 6 that the FDA had fully approved several "Covid vaccines."[10] [*ibid*]

97. The pamphlet, in Q. 3 and Q. 7, claimed that Arrow was following "government directives" from the CDC and the FDA. Significantly, the directives from the CDC and FDA do not advise employers to fire "unvaccinated" employees. Q. 24 states that Arrow will fire "unvaccinated employees" on December 1, 2021. This aspect of Arrow's "Covid policy" derives solely from Arrow. [*ibid*]

98. The pamphlet directed employees, in Q. 8 and Q. 10, to link their personal cell phones to a QR code in an app called "CLEAR health pass" which would track employees "vaccine status" records and install a QR code[11] used to enter the workplace. Arrow did not offer to supply employees with work phones, rather the employee was directed to use their personal devices for the QR code. Third party access agreements of the app were not revealed, nor was it revealed why such this method for gaining access to the workplace was implemented. The CDC and FDA do not advise recording "vaccine status", uploading "vaccine status" on apps, or using programmed QR codes to gain access to the workplace and these aspects of Arrow's "Covid policy" derive solely from Arrow. [*ibid*]

---

9 The term "Covid vaccine" is in quotes because the injection does not prevent transmission or confer immunity which is the scientific definition of a vaccine, the makers only claim the injection may reduce symptoms for the user.
10 Only Comirnaty received FDA approval at this time and it was unavailable in the United States.
11 QR codes can be programmed to scan and "phish" the user's phone, install malware, surveillance, and they pose a security risk by gaining access to programs on the user's phone like banking, calendar, contacts, and passwords.

**99.** Plaintiff states that he researched the privacy policy on the CLEAR health pass site and learned that "CLEAR states that it will share my biometric data, health data, and other personal information with: 1) Service providers (such as order fulfillment and data analytics providers, liveness analysis providers such as iProov, and cloud service providers such as Amazon Web Services); 2) The U.S. Transportation Security Administration and airport authorities; and 3) Other government agencies." [Affidavit ¶ 23] The privacy policy does not state how long CLEAR or the third parties can retain plaintiff's medical information and bio-metric data. The CDC and FDA do not recommend sharing such information with third party vendors and government agencies and this aspect of Arrow's "Covid policy" derives solely from Arrow. [*ibid*]

**100.** The pamphlet in Q. 16, 17 and 18 stated that Arrow would not allow any employee to refuse "Covid vaccine" treatments, and that employees could request what was termed a "religious or medical exemption"[12] Employees listed as "exempt" would still be required to be treated with a mask and "test"[13] for "Covid-19" on an on-going basis and would be subject to quarantine and isolation treatments. [*ibid*]

**101.** The pamphlet in Q. 25 stated that Arrow has no liability insurance coverage for requiring the "Covid vaccine" treatments. [*ibid*]

**102.** Defendant emailed the plaintiff a copy of its "Covid Policy" [Exhibit A-5] which states that any term within the policy which is found to be in conflict with any pre-existing law or statute would be void (pages 2-3 under "H. Policy Alterations"). The policy does not state any authorizing statute from which the policy derives any legal authority.

**103.** The "Covid policy" states in "Section F-vaccination records" that every employee's vaccination record would be shared with unspecified third-parties. [*ibid*]

**104.** On October 11, 2021, plaintiff had a video call with Arrow Human Resources Business Partner Christina Grandinetti in which he intended to discuss the effect his affidavit had on Arrow's imposed medical treatments. Plaintiff pointed out that he had already filed an affidavit in which he declined the treatments based on claiming his rights, and he asked Christina

---

12  Arrow must show sufficient legal duty and sufficient legal authority prior to setting up an "exemption" process. Plaintiff claims he has no legal duty to accept the medical treatments and therefore has no duty he can be "exempted" from.

13  "Covid tests" do not diagnosis disease or determine "infectiousness". "Positive results are indicative of the presence of SARS-CoV-2 RNA; clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status." (from test package insert) PCR tests are known to give positive result without the tester actually being "infectious" which requires a doctor to assess.

Grandinetti for the legal authority and legal duty Arrow was relying upon to impose the "Covid policy". Christina Grandinetti was unable to answer the questions directly, and stated it was "company policy". Christina Grandinetti advised plaintiff to file a "religious exemption" on the online portal "HR Connect".

**105.** On October 21, 2021, based on the meeting, plaintiff sent Arrow a follow-up affidavit titled "Notice of Religious Exemption, Default, and Opportunity to Cure" [Exhibit A-6] in which he included his first affidavit and also included statements that expressed his sincere belief that he must refuse to take a treatment that might alter his immune system (at #1). He also refused the other treatments on the basis that they were used to treat a hypothetical illness which he had not been diagnosed with, and which changed the terms of his employment without being related to his job duties. He claimed that Arrow was perceiving him as impaired because Arrow demanded that he receive medical treatment and was threatening to fire him if he did not get treated (p. 2-3, at # 25-26).

**106.** Plaintiff included a demand to receive a reply to his affidavit of exemption from the policy within ten days, however, Arrow did not acknowledge his affidavit or confirm or deny plaintiff's exemption.

**107.** On October 25, 2021, plaintiff received a company-wide email [Exhibit A-7] stating that anyone who did not register their "vaccine status" on the "CLEAR Health Pass" site by December 1, 2021 would be terminated effective December 2, 2021. Arrow was aware that plaintiff was not taking the "vaccine" treatment or the other treatments, and was aware that he provided a statement of his beliefs and a claim of his property rights, therefore Arrow was aware of plaintiff's treatment status. Arrow was insistent that plaintiff set up his personal phone with digital tracking, and was intending to fire him for not taking this action, despite Arrow already possessing the requested information.

**108.** On November 1, 2021, plaintiff had a second remote call with Christina Grandinetti at 10:15 a.m. Mountain Time in which she repeated that plaintiff should use "HR Connect" to claim religious exemption, even though plaintiff had already filed such an exemption with the company. Arrow had the requested information and Grandinetti could have easily entered plaintiff's status in a database, but she continued to insist that plaintiff use a third-party portal.

109.    Plaintiff wanted the affidavit he drafted accepted, he did not want to engage with online forms and hidden terms of use. Arrow was intent that he give his (implied) consent by using the portal which could include waiving protected rights. (Affidavit ¶ 35)

110.    On November 15, 2021, plaintiff received a "retention bonus" letter, dated November 12, which instructed plaintiff to go on the "HR Connect" site to register to collect a bonus of $10,000, payable a year from the date of the letter, on condition that he was still employed by Arrow on November 12, 2022. Plaintiff did not log into the HR Connect system, to claim this "bonus" because this letter made him even more suspicious of the hidden terms of use. [Exhibit A-8]

111.    On December 1, 2021, plaintiff tried to start work on his work computer, but he was denied access. Mark Sakasai called plaintiff via a video call and told fired him. Plaintiff asked Mark Sakasai why he was being fired and Mark Sakasai stated that it was because plaintiff would not provide his "vaccination status" on the online CLEAR health pass portal. Arrow was fully aware that plaintiff declined the treatment and therefore "knew" his status.

112.    Plaintiff asked to receive that statement in writing and requested a written termination letter from both supervisors Mark Sakasai and Tara Gilley and they each refused. [Exhibit A-9]

113.    Plaintiff researched drafting and filing a "wrongful termination" case in Arapahoe County District Court and learned he needed to file an administrative complaint first.

114.    Plaintiff submitted a Colorado Civil Rights Division ("CCRD") Complaint. [Exhibit A-10] in which he alleged Arrow fired him for refusing treatments and for refusing to waive rights.

115.    On April 4, 2022, The CCRD transferred the case to the EEOC as a religious discrimination case which plaintiff revised on June 15, 2022, to an EEOC complaint for discrimination and retaliation based on disability under the ADA, case number 541-2022-02781. [Exhibit A-13]

116.    On April 19, 2022, plaintiff revoked his prior "Religious Exemption" with Arrow in order to maintain his position based upon property rights and rights protected under the ADA. [Exhibit A-12].

117.    Plaintiff claimed in the revised EEOC complaint that he was being regarded as impaired and this was demonstrated by Arrow considering him in need of treatment without any medical assessment. [Exhibit A-13]

118.    Plaintiff claimed that Arrow violated the ADA by requiring non-job-related medical treatment, tests and disability-related inquiries, even though he worked remotely at all times. [*ibid*]

119.    Plaintiff claimed that Arrow violated the ADA by interfering with his rights to informed consent and medical privacy. [*ibid*]

120.    Plaintiff claimed that Arrow violated the ADA by retaliating against plaintiff for claiming these rights and refusing to waive them through the use of the online portals and apps. [*ibid*]

121.    On July 20, 2022, Arrow's legal counsel submitted a position statement to the EEOC which claimed that Arrow decided that 95% of Arrow's employees need to be vaccinated while working in Arrow's indoor space. This position failed to address the fact that plaintiff worked remotely and that plaintiff claimed his right to refuse treatments. Arrow did not address plaintiff's claim of ADA violations for non-job-related medical treatments, tests and disability-related inquiries. Arrow did provide an assessment demonstrating that plaintiff was a direct threat.

122.    On September 26, 2022, plaintiff submitted a rebuttal to the EEOC [Exhibit A-14] which reiterated plaintiff's remote-worker status.

123.    He identified that Arrow admitted that it never gave notice detailing how the new policy was related to plaintiff's essential job functions which demonstrated that the policy was not related to plaintiff's essential job functions. [*ibid*]

124.    Plaintiff claimed that Arrow admitted that it never performed a direct threat assessment of plaintiff, and identified that Arrow failed to claim any affirmative defense to plaintiff's claims of ADA violations. [*ibid*]

125.    On February 24, 2023, despite Arrows admissions and failures, the EEOC refused to admonish Arrow and instead sent plaintiff a notice of his right to sue. [Exhibit A-15]

126.    A true and correct copy of all written communications are attached in Exhibit A.

## VI. LEGAL STANDARDS

127.    **Discrimination on the basis of disability.** Title I of the ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to...hiring, advancement, discharge...and other terms, conditions and privileges of employment." *42 U.S.C. §12112(a).*

128.    To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

129.    **Retaliation on the basis of disability.** Title I of the ADA not only prohibits employment discrimination on the basis of an individual's disability, but it also prohibits retaliation against any individual who has "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under the ADA." *42 U.S.C. §12203(a).*

130.    To state a claim for ADA retaliation, a plaintiff must allege that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. A plaintiff must allege that his protected activity was the but-for cause of the adverse employment action.

131.    **Prohibited disability-related inquiries and medical examinations of employees.** It is unlawful for an employer to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability, except when the medical examination or inquiry pertains to the ability of an employee to perform job-related functions, and consistent with business necessity. *29 CFR 1630.13(b)* and *29 CFR 1630.14(c).*

## VII. CLAIMS

**Count I. Defendant discriminated plaintiff on the basis of disability.**

132.    The ADA directs courts to construe the definition of "disability" broadly "in favor of expansive coverage to the maximum extent permitted by the terms" of the statute.

133.    The ADA-AA also establishes that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *29 CFR 1630.1(c)(4).*

**134.** Accordingly, courts have noted that the bar to be considered "disabled" under the ADA is not a high one.

**135.** Plaintiff alleges that: (1) his employer employer is a covered entity subject to the ADA; (2) he is "disabled" within the meaning of the ADA; (3) he is qualified to perform his essential job functions; and (4) he is suffering adverse employment actions because of his disability.

**A. Plaintiff's employer is subject to the ADA.**

**136.** Defendant is a covered entity as defined under *29 CFR 1630.2(e)(1)*.

**B. Plaintiff is disabled within the meaning of the ADA.**

**137.** Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

**1. Defendant regarded plaintiff as disabled.**

**138.** An individual is "regarded as" having a disability if they: (1) have a physical or mental impairment that does not substantially limit major life activities but are treated by the covered entity as constituting such limitation; (2) have a physical or mental impairment that substantially limits major life activities only as a result of the attitudes or actions of others toward such impairment; or (3) *have no such impairment but are treated by a covered entity as having a substantially limiting impairment.*

**139.** Under the ADA, the standard for a "regarded as" disability claim simply requires the individual to establish that he has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *42 U.S.C.S. § 12102(3)(A)*.

**140.** For a "regarded as" claim a plaintiff does not need to plead whether the impairment substantially limited a major life activity. Whether a plaintiff is regarded as disabled turns on the *employer's perception of the employee as demonstrated by the actions it took.*

141.   What matters for the "regarded as" theory is whether the employer perceived plaintiff as impaired, not whether he was actually impaired. This more liberal standard makes it significantly easier for a plaintiff to show disability.

142.   In this case, plaintiff is claiming that his employer, through the "Covid policy", treats him as if he has a substantially limiting impairment, because it requires treatment for the impairment in order to perform his job duties.

143.   Through its "Covid policy", defendant regards and treats plaintiff as if he has an on-going and indefinite condition of impairment that warrants the mitigation measures outlined in its policy.

144.   Defendant imposed several medical treatments, tests and inquiries upon plaintiff that, in light of defendant's "Covid policy", demonstrate that defendant perceives plaintiff as a direct threat to others unless plaintiff is treated by mitigation measures which include "testing", "vaccination", and mask-wearing.

145.   Defendant imposed adverse employment actions on plaintiff for no other reason than because he refused treatments, expressed opposition and refused to waive his rights.

146.   Defendant imposed materially adverse changes in the terms and conditions of plaintiff's employment because the "Covid policy" perceived plaintiff as a direct threat.

147.   The perception that plaintiff has a disability was formed without an individualized assessment or any *bona fide* medical diagnosis.

148.   For defendant, it is not relevant if plaintiff actually has the contagious disease, as it imposes medical treatments, tests and inquiries regardless.

149.   Defendant refuses to allow plaintiff to continue working without first submitting to its discriminatory "Covid policy" measures.

150.   Defendant's "Covid policy" impairs plaintiff's ability to perform his essential job functions by imposing mitigation measures that create a physical impairment that substantially limits plaintiff's ability to engage in major life activities, such as working.

**2. Defendant made a record of disability by misclassifying plaintiff as impaired because plaintiff refused or opposed "treatment".**

**151.**     To state a prima facie disability claim based on a "record of" a disability, a plaintiff must plausibly allege a "history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, *or was misclassified as having had such an impairment.*" 29 C.F.R. § 1630.2(k)(2) (emphasis added)

**152.**     The "Covid policy" itself misclassifies plaintiff as having an impairment that it perceives as substantially limiting plaintiff's ability to perform plaintiff's job functions "safely".

**153.**     Defendant made a record of disability by classifying plaintiff as an "untreated" employee because plaintiff refused "Covid vaccines", mask-wearing, and submitting to "PCR testing",

**154.**     Defendant made a record of disability by classifying plaintiff as an "untreated" employee because he opposed having his medical privacy rights violated by third party vendors and government entities listed and unlisted on the CLEAR health pass portal site and through the use of its QR codes, and the "HR Connect" vaccine attestation portal.

**155.**     Based upon this record, defendant has taken several adverse employment actions towards plaintiff. Defendant repeatedly interfered with plaintiff's rights and tried to harass and coerce plaintiff into compliance with prohibited medical treatments, tests and inquiries.

**156.**     Defendant also punished plaintiff with materially adverse changes in the terms and conditions of employment specifically because plaintiff refused prohibited medical treatments, tests and inquiries; and because plaintiff claimed exclusion to the "Covid policy" because of rights protected by the ADA.

**157.**     This is a case of a perceived disability, thus it follows that the record of impairment made in this case is a misclassification of a perceived impairment.

**158.**     Defendant further insists that employees misclassified as impaired because they are "untreated" submit to on-going "PCR testing", which clearly demonstrates that the employer classifies and regards "untreated" employees as still contagious/impaired, while "vaccinated" employees are no longer classified and perceived as contagious/impaired.[14]

**159.**     It is evident that the employer is misclassifying plaintiff by gathering "vaccine status" records. However, the "unvaccinated status" (declared or assumed) is not the disability; rather once the

14  Despite the fact that the  "Covid-19 vaccine" does not claim to prevent infection or provide immunity. It is nonsensical to insist that plaintiff take a "Covid-19 vaccine" for the benefit of someone else's health. It is only advertised to "lessen symptoms" which only provides a benefit to the user.

defendant records the "vaccine status" it alters terms and conditions of employment for the "unvaccinated" and implements adverse employment actions which demonstrates that the "Covid policy" misclassifies all "untreated" employees as impaired under the "record of" prong.

160.    Defendant, by its own policies, attitude toward plaintiff, written communications, method of record-keeping and general treatment of plaintiff, created a set of facts that satisfy the criteria under the ADA's "regarded as" and "record of" disability prongs.

**3. Defendant failed to conduct any individualized assessment to determine that plaintiff is a direct threat.**

161.    The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. *29 CFR § 1630.2(r)*

162.    Defendant has failed to conduct any individualized assessment establishing that plaintiff is a direct threat.

163.    Defendant simply punishes plaintiff for his good faith refusal to participate in its "Covid policy" on the pure speculation that plaintiff has a disability.

164.    Defendant acts on the false premise that it has the legal duty and authority to protect plaintiff and everyone else from contracting such a deadly, contagious disease (disability).

165.    Defendant claiming that plaintiff has a deadly contagious disease, or that he might someday become infected with such a disease, is not a defense to violating the ADA, specifically, *29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d).*

166.    Defendant cannot rely upon news or public announcements to determine that plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

167.   Defendant acts irrationally by regarding plaintiff and others as having an illness without any diagnosis[15], and then seeks to treat everyone with the same medical intervention without any diagnosis.

168.   Additionally, defendant cannot allege that the medical treatments established in its "Covid policy" are necessary to guarantee the "safety" of its employees, when the treatments are non-job-related, the treatments imposed are only claimed to benefit the user, there has been no actual diagnosis of disease prior to imposing the treatments, and defendant offers certain employees the possibility of being "exempted" from certain treatments for medical or religious reasons, and the plaintiff is a full-time remote worker.

169.   Plaintiff is not required to discuss the nature of an un-assessed disability he is "assumed" to have; nor is he required to request any "reasonable modifications", for an un-assessed disability he is assumed to have.

170.   Plaintiff is protected under the ADA and he claimed his rights.

171.   Plaintiff is not required to use the language of the ADA to claim this protection, however plaintiff did specifically give notices to the defendant that he claimed all his rights to informed consent, medical privacy, to be free from the unfounded perception that he is impaired and a threat to the safety of others, to not have his employer try to impose treatments, test and inquiries upon him that have nothing to do with his job duties, to not being retaliated against for claiming and not waiving rights, to have the right to meaningful redress, and to not be regarded as having a disability by defendant's policy.

**C. Plaintiff is qualified to perform the essential functions of his job.**

172.   Plaintiff is qualified for his job as a Senior Data Engineer and has all the necessary credentials to carry out the required duties of his position.

173.   Plaintiff is obviously qualified for a job he was already doing, and he was willing to continue performing his job functions.

---

15   This behavior is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health. The "Covid policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

**174.** Despite plaintiff's qualifications, plaintiff was disingenuously denied equal access to defendant's premises and was terminated.

**D. Plaintiff has suffered adverse employment actions because of perceived disability.**

**175.** Under the ADA, a plaintiff suffers an adverse employment action when he endures a materially adverse change in the terms and conditions of employment or when his rights are interfered with.

**176.** Plaintiff alleges that the terms and conditions of employment have been altered and diminished.

**177.** Plaintiff alleges that his rights were interfered with.

**178.** The "Covid policy" altered the terms regarding working conditions: plaintiff's employer established vaccine, testing and masking mandates which it imposed upon plaintiff even though he worked from home.

**179.** The "Covid policy" altered the terms regarding discipline: the consequence for not abiding by the policy was disciplinary action including termination. Plaintiff was terminated because he claimed his rights to medical privacy and declined all treatments, and because he refused to use the online portals which waived his privacy rights despite defendant's many attempts to coerce and lure him into using these undisclosed agreements while he was fully opposing the policy.

**180.** The "Covid policy" altered the terms regarding plaintiff's medical privacy: plaintiff was asked to disclose his vaccination status (disability-related inquiry) and submit to non-job related medical examinations on two specific online portals which contained undisclosed terms of service and third party agents.

**181.** The "Covid policy" altered the terms of the contract to include prohibited medical tests, treatments and inquiries. The ADA prohibits non-job related for all employees, not just for employees who claim disability.

**182.** The "Covid policy" refused to recognize plaintiff's right to refuse non-job-related medical test, treatments and inquiries.

**183.** The "Covid policy" also refused to recognize plaintiff's right to refuse disability-related inquiries ("vaccine status" and "Covid tests").

**184.** Plaintiff's employer has imposed prohibited measures and refused to recognize his claim of protected status, especially after he opposed the policy and pointed out that the imposed

mitigation measures were not compulsory by law and neither defendant nor plaintiff had a legal duty to "prevent the spread of Covid".

185.    Ultimately, plaintiff was terminated for refusing treatments, tests and inquiries as well as for refusing to waive his rights.

186.    The adverse actions alleged above demonstrate that defendant discriminated against plaintiff on the basis of disability and retaliated against him specifically because he refused treatment while opposing the encroachment on his rights established by defendant's "Covid policy".

187.    The adverse actions alleged above demonstrate that "Covid policy" presumes that plaintiff is disabled <u>because he remains "untreated", and because he consistently opposed the treatments, tests and inquiries</u>.

188.    Plaintiff's allegations satisfy the elements of discrimination and show that he falls within a protected group, that he is qualified for the position he held, that he was subjected to non-job-related medical inquiries, tests and treatments, and he was subject to adverse employment actions and that these adverse employment actions are taken under circumstances which constitute unlawful discrimination.

**Count II. Defendant retaliates against plaintiff on the basis of disability.**

189.    Plaintiff engaged in activity protected by the ADA by opposing his employer's discriminatory "Covid policy", by pointing out the defendant's ADA violations, and by arguing that defendant was not exempt from complying with the ADA.

190.    Defendant is aware that plaintiff claimed his rights consistently and unceasingly and also sent defendant two affidavits in support of these claims (protected activity), but defendant decided to ignore the claims.

191.    Defendant has taken adverse employment actions against plaintiff.

192.    Plaintiff's opposition to and non-compliance with defendant's "Covid policy" is the only reason for the adverse employment actions.

**A. Plaintiff engaged in activity protected by the ADA.**

**193.** Plaintiff protested and opposed his employer's discriminatory "Covid policy" and defendant is aware that plaintiff engaged in such protected activity.

**1. Plaintiff protested and opposed defendant's discriminatory "Covid policy".**

**194.** Defendant's "Covid policy" regards employees as disabled, and uses standards, tests, and criteria that screen out employees with perceived disabilities which thereby, constitutes disability discrimination, in addition to what is described in the following allegations.

**195.** Plaintiff, in good faith, believes that defendant's "Covid policy" is unlawful because:

    **a)** it is not mandated by statute;

    **b)** it infringes upon his rights to property, bodily integrity, medical privacy, informed consent, which are protected under the ADA; and

    **c)** it has been disproportionally applied to him since he refused the treatments and online measures and opposed the policy based on his rights.

**196.** As argued above, defendant's "Covid policy" is a failed policy because it does not include several necessary provisions to:

    **a)** remain compliant with disability law or address the needs of employees with disabilities or claims of violations;

    **b)** protect the medical privacy of employees, and specifically plaintiff's.

**197.** Additionally, the "Covid policy" lacks any authorized enforcement provisions and relies either on plaintiff to "voluntarily" waive his rights to medical privacy, informed consent, and rights protected under the ADA **or** upon defendant's willingness to force submission to policy in exchange for disaster funding.

**198.** Defendant's "Covid policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "treated" and those who are "untreated" and giving them disparate terms and conditions of employment.

**199.** It is not necessary to allege that defendant's agents personally regard plaintiff as having a disability. Defendant's "Covid policy" itself clearly demonstrates that defendant seeks to impose

the policy's provisions upon plaintiff based upon the pure speculation, stereotype and generalization that he is impaired and in need of treatment.

200.   Furthermore, defendant's "Covid policy" has not been uniformly or universally applied to plaintiff, a remote worker, since defendant began making a record of such disability by mis-classifying plaintiff as having an impairment which needs to be treated or cured by defendant's "Covid policy".

201.   Upon giving defendant notice that the imposed medical treatments demonstrated that he regarded as having and impairment or a disability,[16] the plaintiff identified himself as being within a protected group.

202.   Plaintiff claimed his rights to refuse defendant's mitigation measures through a process of good faith opposition and he engaged in a protected activity.

203.   Defendant imposes the policy on everyone equally but fails to recognize that plaintiff:

a)   claimed protected status with his affidavits and opposition and thus is in a separate class to everyone else who has not invoked their rights protected under the ADA;

b)   gave notice of being regarded as having impairments requiring medical treatments and a disability; and

c)   objected to interference with his medical privacy rights, right to informed consent and right to refuse treatments.

d)   objected to submitting to non-job-related and disability-related medical tests, inquires and treatments.

204.   Defendant imposes its "Covid policy" on everyone equally but treats all those that attempted to exclude themselves from the mitigation measures based upon claiming their rights in <u>disparate</u> ways.

205.   As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because e*veryone is required to use the stairs and the policy is applied equally to everyone*. It is clear that this scenario does not allow disability rights.

---

16 As an employee he is, of course, understood to be a "qualified individual".

206.    Plaintiff alleges that the following conduct constituted protected activity: opposing non-job-related medical treatments, tests and inquiries and communicating his opposition to his superiors; discussing his remote-worker status with his supervisors, asking for evidence of legal duty and legal authority on multiple occasions; sending a timely notice of exclusion to the policy; claiming his rights to medical privacy informed consent, to not take experimental injections and his property rights protected under the ADA; drafting two affidavits claiming his rights and serving them both on the defendant, engaging HR to find a resolution, identifying the reasons he declined to use the online portals to enter his information or use the app on his personal phone, continuously refusing to waive his rights despite coercion and bribery of $10,000, filing a wrongful termination complaint, filing a CCRD complaint, filing an EEOC complaint, engaging in the EEOC rebuttal process, filing this complaint, inter alia.

207.    Plaintiff exercised his right to refuse defendant's "Covid policy" mitigation measures based upon a good faith belief that the policy does not apply to him because:

a)    the policy violates the ADA;

b)    defendant has failed to establish any exemption or exception to its legal duty to comply with the ADA;

c)    the policy is not related in any way to his essential job function;

d)    plaintiff works remotely and cannot be considered a direct threat and the policy is not based upon any assessment of direct threat; and

e)    defendant has failed to give plaintiff conspicuous notice as the manner in which its policy is related in any way to his essential job function.

208.    Exercising and claiming rights is a protected activity and defendant's "Covid policy" is not equally or universally applied to plaintiff because he has given notice of claiming his rights and that he was being perceived as in need of medical treatment for a perceived impairment and disability and is therefore in a protected class and engaged in a protected activity.

**2. Defendant was not exempt from complying with the ADA.**

209.    Since plaintiff is in a protected class and has engaged in protected activity, he is not required to participate in defendant's policy under *29 CFR Part 1630.9(d)*, unless defendant establishes an exemption or exception to its legal duty to comply with the ADA.

210.    Defendant has failed to identify or describe any set of facts establishing that:

a) plaintiff's good faith refusal to participate in defendant's "Covid policy" has created any undue financial hardship because the plaintiff remains "untreated"; or

b) plaintiff's good faith refusal to participate in defendant's "Covid policy" has fundamentally altered normal business operations because the plaintiff remains "untreated".

211.    Defendant will actually lose funding for being found non-compliant with its duties under the ADA.

212.    Defendant requires non-job-related medical examinations of plaintiff that are not consistent with any conceivable business necessity.

213.    Defendant makes disability-related inquiries of plaintiff that are not consistent with business necessity and not permitted under *29 CFR Part 1630.13(b)*.

214.    Defendant cannot claim the perceived disability is both "transitory and minor" because defendant retaliates against the plaintiff based upon <u>perceiving</u> the plaintiff as a "direct threat" with an on-going condition of contagiousness, whereas transitory and minor applies only to actual, diagnosed impairments.

215.    If the perceived disability is **both** transitory **and** minor, such as having the common cold, defendant should establish the necessity of implementing such a draconian policy.

216.    There is no established end-date when defendant would cease regarding plaintiff in need of mitigation.

217.    Defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that plaintiff individually is a direct threat.

218.   To this day, defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including plaintiff.

219.   Defendant cannot claim that it perceived plaintiff as a "direct threat" of an undiagnosed contagious disease and simultaneously claim that its perception is both "transitory and minor".

220.   This perception has been ongoing since defendant implemented its "Covid policy". What matters in a "regarded as" claim is defendant's perception.

221.   Plaintiff's allegations easily satisfy the elements of discrimination by showing that he falls within a protected group, that he is qualified for the position he held, that he was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful retaliation.

**B. Defendant is aware of plaintiff's participation in the protected activity.**

222.   Plaintiff has claimed his rights and expressed his opposition on more than one occasion.(See 206 above) Therefore, it can be concluded that defendant is aware of plaintiff's participation in the protected activity.

**C. Defendant has subjected plaintiff to materially adverse employment actions.**

223.   Plaintiff has sustained adverse employment actions as alleged in detail above.

224.   Defendant's "Covid policy", as alleged herein and described in more detail in plaintiff's affidavit, describes materially adverse changes in the terms and conditions of employment, compared to the conditions of employment which existed prior to defendant's implementation of its "Covid policy".

225.   These changes do not simply create an inconvenience for plaintiff, they substantially altered the manner in which he was able to do his job and defendant substantially impaired his ability to perform his essential employment duties.

226.   Each of the foregoing adverse employment actions resulted from every effort defendant undertook to coerce plaintiff into submitting to its "Covid policy" mitigation measures, and each adverse employment action described herein was causally related to plaintiff's good faith refusal of the mitigation measures.

227.    Each adverse employment action took place within moments of, or in direct response to, plaintiff claiming his rights, expressing violations of his rights and his good faith refusal to comply with defendant's policy.

228.    These facts demonstrate defendant's adverse employment actions derive from the "Covid policy" and defendant' failure to comply with the ADA.

**D. A causal connection exists between the adverse employment actions and the protected activity.**

229.    Upon giving defendant notice that he opposed non-job-related medical treatments, tests and inquiries, that were also disability-related inquiries, defendant began retaliating against plaintiff by interfering with his rights, coercing him to waive his rights, threatening to fire him for claiming his rights and opposing the policy. Ultimately, he was fired for being "untreated" refusing to waive his medical privacy rights.

230.    Defendant's implementation of the "Covid policy" is a direct and proximate cause of defendant's decision to require new terms and conditions of employment that diminished plaintiff's job security and benefits of the job, interfered with plaintiff's rights, increased discipline, and terminated plaintiff's employment.

231.    Simply put: defendant implemented a policy which regards plaintiff as a direct threat and misclassifies plaintiff as impaired because he is "untreated", when the plaintiff refused non-job-related treatments, tests and inquiries that were also disability-related inquiries; defendant responded with adverse employment actions.

232.    Beginning from the moment he gave notice to defendant, plaintiff suffered adverse employment actions[17] and defendant continued attempting to impose its "Covid policy" upon plaintiff.

233.    Defendant ignored and denied his affidavit and claim of disability, then it retaliated against him for refusing non-job-related mitigation measures as alleged in plaintiff's affidavit.

234.    Defendant's "Covid policy" itself creates the causal connection between the imposed measures and the consequences for refusing them, including termination.

---

[17] Under the ADA, adverse employment actions include any actions taken which interfere the with plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against plaintiff for claiming their rights.

235.   It is defendant's "Covid policy" itself which demonstrates that plaintiff is being perpetually classified as a "direct threat" because he remains "untreated" for a hypothetical disease.

236.   The policy itself issues deadlines and consequences which vividly demonstrate the causal connection between medical demands and adverse employment actions.

237.   The moment plaintiff refused non-job-related medical treatments and inquiries he was subjected to the above-mentioned adverse employment actions, and was scheduled for termination.

238.   Plaintiff's allegations satisfy the elements of retaliation by showing that he has engaged in protected activity, that defendant is aware of plaintiff's participation in said protected activity, that defendant has subjected plaintiff to adverse employment actions, and that there is a causal connection between the protected activity and defendant's retaliatory conduct.

**Count III. Defendant imposed prohibited disability-related inquiries and medical examinations upon plaintiff.**

239.   It is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability, except when it is job-related and consistent with business necessity or they relate to the ability of an employee to perform job-related functions. *29 CFR § 1630.13(b) and § 1630.14.*

240.   The statutory language makes clear that the ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities. The use of the term "employee" in this provision reflects Congress' intent to cover a broader class of individuals and to prevent employers from asking questions and conducting medical examinations that serve no legitimate purpose.

241.   Even if the Court found that plaintiff is not a qualified individual with a disability, he is protected by the ADA and has a right to challenge a disability-related inquiry or medical examination that is not job-related and consistent with business necessity, because requiring an individual to show that they are a person with a disability in order to challenge a disability-related inquiry or medical examination would defeat this purpose.

242.    Defendant requires non-job-related medical examinations and disability-related inquiries of plaintiff that are not consistent with any conceivable business necessity and not permitted under *29 CFR Part 1630.13(b)*.

**A. Defendant's "Covid policy" includes disability-related inquiries and medical examinations.**

243.    A disability-related inquiry is a question that is likely to elicit information about a disability.[18]

244.    A medical examination is a procedure or test that seeks information about an individual's physical or mental impairments or health.[19]

245.    Defendant's "Covid policy" imposes certain non-job-related and disability-related medical inquiries and examinations including, but not limited to: inquiring about "vaccination status"; "health surveys"; and regular "Covid testing".

246.    These inquiries and examinations are disability-related because they are designed to reveal or treat the disability perceived by the "Covid policy". The inquiry is designed to reveal whether the employee continues to be a contagious "direct threat"; it is designed to reveal a perceived disability.

247.    The inquiry regarding plaintiff's "vaccination status" does objectively qualify as a disability-related inquiry because it is designed to determine which employees are "untreated", which is considered as an impairment that needs correction. Then, defendant sifts through the pool of "untreated" employees to find the ones who also "refuse treatment". These employees, including plaintiff, are fired for no other reason than because they "refuse treatment". This is another objective demonstration that the "Covid policy" considers all "un-treated" employees as direct threats which is another way of saying they are perceived as too impaired to be allowed to work.

248.    Moreover, the "Covid policy" erroneously interprets a tiny bit of data such as a "positive" PCR test[20], which constitutes a medical examination, as if it were an actual diagnosis of a contagious disease. This practice results in the absurd situation of relying upon a lay-man's "diagnosis" or "self-diagnosis" based upon interpreting one piece of data from a diagnostics tool rather than upon a physician's professional assessment.

---

18  See the EEOC's Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA. Available at: https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#
19  Idem.
20  PCR tests do not diagnose "Covid-19", and the box inserts declare this fact.

**249.** Defendant cannot rely upon news or public announcements to determine whether plaintiff individually poses a "direct threat" because the statute requires a *bona fide* medical examination and diagnosis by a physician.

**250.** The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. *29 CFR § 1630.2(r).*

**251.** Establishing that a particular employee is a "direct threat" can only be done through an evidentiary and medical inquiry, not an employer's "reasonable conclusion".

**252.** The latest EEOC guidance document for employers implementing "Covid policy" measures is instructive. It states that an employer must have <u>objective evidence of a disease</u> before it makes medical inquiries or imposes testing. The EEOC counsels employers that if they want to ask a particular employee[21] to "test" and answer medical inquiries, then that employer is required to first have a diagnosis of that individual employee before making disability-related inquiries.

> **A. Disability-related inquiries and Medical Exams**
> 9. "If an employer wishes to ask only a particular employee to answer such questions, or to have a temperature reading or undergo other screening or testing, the ADA requires the employer to have a reasonable belief based on objective evidence that this person might have the disease."[22]

**253.** Defendant never performed an individualized assessment thus it did not have the "objective evidence" required to proceed.

**B. Defendant's "Covid policy" was not job-related nor consistent with business necessity.**

**254.** Defendant has never provided notice of any kind to plaintiff, advising plaintiff as to the manner in which these inquiries and medical examinations are related to his essential job function.

---

21 Such as employees who refuse to answer attestation questions for example.
22 "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws *Technical Assistance Questions and Answers" - Updated on July 12, 2022*. https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws

255.  In fact, none of the mitigation measures are related to plaintiff's essential job function because plaintiff is able to continue performing his essential employment duties without participating in defendant's "Covid policy".

256.  Plaintiff also alleged in his testimony and in written communications[23] that he is both willing and able to continue performing his employment duties and that defendant's "Covid policy" is not related in any way to his essential job functions.

257.  Furthermore, defendant did not establish that its "Covid policy" was consistent with any conceivable business necessity.

**C. Defendant violated plaintiff's rights protected by the ADA by imposing its "Covid policy" upon him.**

**(a) Defendant imposes prohibited medical treatments upon plaintiff that are not job-related nor consistent with business necessity.**

258.  Defendant also assumes that its policy is the proper treatment to mitigate the effects of "Covid-19" in the workplace. However, defendant has not consulted any *bona fide* or competent medical professional regarding the involuntary application of its "Covid policy" upon its employees.

259.  Defendant's "Covid policy" imposes certain non-job-related medical treatments including, but not limited to: taking experimental "vaccines"; wearing a surgical masks over the face; isolation; and segregation.

260.  These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related. In addition, defendant is trespassing on plaintiff's medical privacy rights and informed consent, both of these issues are expressed in the ADA.

261.  Defendant has not provided proof that a "Covid-19 vaccine" prevents infection and transmission of a disease as defined by modern scientific standards.

262.  Defendant has not provided proof that taking the "Covid-19 vaccine" would prevent anyone other than the user from experiencing symptoms.

---

23  A true and correct copy of which is alleged as Exhibit A.

**263.** A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

**264.** The "Covid-19 vaccines" demanded by defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental "vaccines" have been <u>approved</u> by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase.

**265.** The only "Covid-19 vaccine" that is FDA-<u>approved</u>, Comirnaty, is not commercially available in the United States, should plaintiff choose to take it.[24]

**266.** The "Covid policy" as implemented by defendant allows un-skilled and unlicensed individuals to impose medical inquiries, tests and interventions upon employees because commentary on a website states that such inquiries, tests and interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice (e.g., CDC[25], EEOC[26], etc.).

**267.** Defendant has never provided notice of any kind to plaintiff, advising plaintiff as to the manner in which these medical treatments are related to his essential job function.

**268.** In fact, none of the mitigation measures are related to plaintiff's essential job function because plaintiff is able to continue performing his essential employment duties without participating in defendant's "Covid policy".

**269.** Plaintiff also alleged in his testimony and in written communications[27] that he is both willing and able to continue performing his employment duties and that defendant's "Covid policy" is not related in any way to his essential job functions.

**(b) Defendant interferes with plaintiff's right to medical privacy.**

**270.** Information regarding the medical condition or history of an employee shall be treated as a confidential medical record and shall not be used for any purpose inconsistent with the ADA. *29 CFR §1630.14(c).*

---

24  There is controversy as to whether the Moderna "Spikevax" formulation has actually received approval and it also is not commercially available. Regardless, the EUA period is still in effect, as of the date of this filing it has not been rescinded by the FDA.
25 https://www.cdc.gov/other/disclaimer.html
26 https://www.eeoc.gov/disclaimer
27  A true and correct copy of which is alleged as Exhibit A.

271.    Defendant's "Covid policy" violates *29 CFR §1630.14(c)* of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status" and vital statistics and "PCR"[28] testing history) with undisclosed third party entities and government agencies without any regard to confidentiality.

272.    Defendant's "Covid policy" violates *29 CFR §1630.14(c)* of the ADA because it involves sharing non-job-related medical classifications through plaintiff's personal cellphone using QR codes with hidden programming which could gain access to plaintiff's phone data and bio-metric data.

273.    The "Covid policy" includes no provision to preserve the medical privacy rights of any employee, including plaintiff's.

**(d) Plaintiff is not required to request religious nor medical exemptions from defendant's Covid policy.**

274.    Plaintiff is not required to request exemptions from defendant's "Covid policy" for religious or medical reasons because none of its provisions are related to plaintiff's essential job function.

275.    Plaintiff is not required to request any accommodations or reasonable modifications because none of the "Covid policy's" provisions are related to his essential job function.

276.    While plaintiff has no duty to request any reasonable modification or accommodation to defendant's "Covid policy", he was deceptively informed that he must request a "religious or medical exemption" and use an online portal with undisclosed terms to file it.

277.    The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in *29 CFR Part 1630.2(o)* because the "exemptions" offered are not job-related adjustments to the workplace environment.

278.    Defendant's policy does not impose any new legal duties upon plaintiff from which he could be exempted or needs to request exemption from.

279.    Defendant's deceptive "exemption" practice is only intended to give the appearance of fairness because it can arbitrarily deny or revoke exemptions.

280.    Defendant refused to recognize plaintiff's two affidavits claiming "exemption" from the policy which demonstrates the defendant is operating in bad faith.

---

28 Polymerase Chain Reaction

281.   Defendant has not disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which plaintiff is being "exempted".

282.   The ADA protects all employees, not just those with disabilities, from non-job-related medical treatments, tests and inquiries and invasions of medical privacy.

283.   Plaintiff demands a trial by jury.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions are unlawful; (ii) back pay; (iii) compensatory damages in whatever amount plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this 22 day of May, 2023.

Tobin Bereznak

Tobin Bereznak. Plaintiff in *propria persona*